# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

SIMPLOT AB RETAIL SUB, INC.,

    Plaintiff/Counter-Defendant,

vs.

NORTH LIBERTY LAND, LLC, and
JAMES VOGT,

    Defendants/Counter-Claimants.

No. 18-CV-4047-KEM

**MEMORANDUM OPINION
AND ORDER**

_____

## *TABLE OF CONTENTS*

*I.  BACKGROUND*.................................................................... 2

*II.  DISCUSSION*...................................................................... 5

  *A.  Fraud* ........................................................................... 6

  *B.  Negligent Misrepresentation* ............................................. 8

  *C.  Breach of Contract:  Credit Application Agreement*................. 9

  *D.  Breach of Contract:  Invoices/Finance Charges* .................... 10

  *E.  Breach of Contract:  Rebates* ....................................... 11

  *F.  Unjust Enrichment*........................................................ 19

  *G.  Breach of the Implied Covenant of Good Faith and Fair Dealing* ............ 20

*III. CONCLUSION* ................................................................. 27

Plaintiff/Counter-Defendant Simplot Ab Retail Sub, Inc., moves for summary judgment on all counterclaims brought by North Liberty Land, LLC, and James Vogt

(North Liberty's president and majority owner).  Doc. 58.  I **grant the motion in part and deny it in part**.

## I.    BACKGROUND

The following facts are recited in the light most favorable to North Liberty,[1] the nonmoving party.  North Liberty began purchasing agronomy products from Simplot in October 2014.  Simplot SOF; NL Resp. SOF.[2]  In early 2015, Thomas Hart, a regional manager and salesperson for Simplot, asked Vogt about using the North Liberty account for "sideways transactions."  NL Prior App. 1.  In a sideways transaction, Simplot would bill North Liberty's account for products ordered by other customers who were not registered dealers to increase the rebates from the product manufacturer.  *Id.*  In exchange, Hart promised that North Liberty "would receive a portion of the enhanced rebate from each 'sideways transaction.'"  *Id.*  Although the purchases from the sideways transactions would be billed to North Liberty's account, Hart assured Vogt that North Liberty would not be liable for payment; instead, the product would be shipped directly to the customer who ordered it, and that customer would pay for it.  *Id.* at 1, 3.  Vogt agreed that Hart could use North Liberty's account for sideways transactions but requested that Hart obtain his consent before each product shipment.  *Id.* at 1-2.  Hart obtained Vogt's consent to use the North Liberty account for a sideways transaction only once, in 2015.  *Id.*

---

[1] When discussing North Liberty's and Vogt's arguments as parties in this litigation (represented by the same attorneys and briefs), North Liberty collectively refers to both parties.

[2] "Simplot SOF" refers to Simplot's Statement of Facts, filed at Doc. 58-1, and "NL Resp. SOF" refers to North Liberty's Response to Simplot's Statement of Facts, filed at Doc. 68-1. "NL SOF" refers to North Liberty's Statement of Facts, filed at Doc. 68-2, and "Simplot Resp. SOF" refers to Simplot's Response to North Liberty's Statement of Facts, filed at Doc. 76. "Simplot App." refers to Simplot's Appendix, filed at Doc. 58-2 and Doc. 58-3; "NL App." refers to North Liberty's Appendix, filed at Doc. 68-3; and "NL Prior App." refers to North Liberty's Appendix for the prior summary judgment motion, filed at Doc. 25-2.

2

Throughout 2015 and 2016, North Liberty continued to purchase products from Simplot. Simplot SOF; NL Resp. SOF. In December 2016, North Liberty signed Simplot's Credit Application Agreement, which set forth the terms of North Liberty making purchases from Simplot on trade credit extended by Simplot. Simplot App. 50-51. Around the same time, Vogt signed a Guaranty Agreement for North Liberty's purchases on credit. Simplot App. 52-55. North Liberty continued to make purchases from Simplot through December 2017. Simplot SOF; NL Resp. SOF. Unbeknownst to North Liberty, Hart used North Liberty's account for several sideways transactions in 2016 and 2017, charging North Liberty for products delivered to other customers. *See* Simplot App. 238-39; Simplot SOF.

In June 2017, Renee Sterler, North Liberty's bookkeeper, noticed that the North Liberty account had been used for a sideways transaction when North Liberty received a "return invoice" for a product it had never ordered or returned. NL App. 93. Sterler requested that Simplot provide a list of products purchased using the North Liberty account on behalf of other customers. *Id.* This information has never been provided, in this litigation or otherwise. From June to October 2017, Sterler communicated with multiple people in the Simplot organization, requesting bills of lading and delivery information for more than $500,000 worth of product charged to North Liberty's account that Sterler believed had not been ordered by or delivered to North Liberty. NL App. 61-75, 91-93. The requested information proved difficult to obtain, since some Simplot employees did not know about Hart's use of the North Liberty account for sideways transactions—perhaps because such transactions are considered unethical—and Hart was undergoing cancer treatment and refused to provide the information to others in the Simplot organization. *See* NL SOF; Simplot Resp. SOF; NL App. 7, 61-66. Hart acknowledged at the end of October 2017, however, (to someone in the Simplot organization, not to Sterler) that he had invoiced North Liberty for products shipped to other customers and that he had planned to "reconcil[e]" the North Liberty account, but then became sick. NL App. 69-71. Hart also indicated that he had likely thrown away

3

bills of lading for the sideways transactions. NL App. 71-72. Because North Liberty was overcharged, it refused to pay invoices until it became clear what it actually owed, and it indicated it would not be paying any finance charges (interest) accrued while seeking answers about the use of its account. *See* NL App. 66.

Hart died in February 2018. In March 2018, Simplot recognized four sideways transactions charged to North Liberty's account, involving orders of Status, Sharpen, Quadris, and Cobra. Simplot App. 238-39. These orders were the ones originally identified by Sterler in October 2017. NL Prior App. 41; Simplot App. 363. Simplot also noted that it would give North Liberty a refund related to a fifth order it had discovered (for Optil), since it did not have a bill of lading for that order. *Id.*; Simplot App. 239. Simplot indicated that it would credit North Liberty's account for the purchase price of the five products and the accrued finance charges related to those products. Simplot App. 238-29. Simplot also noted that North Liberty's account had already received a rebate credit for the Sharpen and Status orders, and Simplot would also provide a rebate credit for the Quadris purchase (no rebate was provided for the Cobra order, likely because the entire order ended up being returned). *Id.*

In June 2018, Simplot initiated this lawsuit, seeking more than $1.5 million North Liberty allegedly owed for products it had ordered from Simplot under the Credit Agreement, in addition to interest and finance charges. Docs. 1, 9, 23. North Liberty has continued to dispute Simplot's calculation of the amount owed on the account due to lack of proof that products invoiced to North Liberty were actually ordered by and delivered to North Liberty, as opposed to other dealers in sideways transactions.

During the pendency of this litigation, in June 2019, North Liberty identified four additional charges to its account for product it never received, involving the product Callisto. Simplot SOF ¶¶ 39-42; NL Resp. SOF; NL Prior App. 36. After investigation, Simplot discovered that three of the disputed Callisto invoices had been partially paid by another company in August 2016, and this payment had been applied to North Liberty's account at that time. Simplot SOF ¶ 52; NL Resp. SOF; Simplot App. 150, 363. The

4

balance of these three Callisto invoices not covered by the partial payment were credited to North Liberty's account as discounts (although it is unclear when these discounts were applied to North Liberty's account). *See* Simplot App. 46, 216, 218, 220, 222, 363-65. With regard to the remaining Callisto order,[3] it is Simplot's position that North Liberty has forfeited any challenge to this invoice by failing to dispute it in a timely manner, and Simplot has not credited North Liberty's account based on this order and seeks through this litigation payment for this order and related finance charges. Simplot App. 44.

Simplot moves for summary judgment on North Liberty's counterclaims: fraud, negligent misrepresentation, multiple counts of breach of contract, unjust enrichment, and breach of the implied covenant of good faith and fair dealing. North Liberty resists. The parties consented to the exercise of jurisdiction by a United States magistrate judge (Doc. 18), and I held telephonic argument on the summary-judgment motion on September 11, 2020 (Doc. 82). After oral argument, I allowed the parties time to submit additional citations to the record on the issues of reliance and the calculation of rebates. Docs. 84, 85.

## II. DISCUSSION

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant [a motion for] summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." For the plaintiff to avoid summary judgment, sufficient evidence must exist "on which the jury could reasonably find for the plaintiff.'" *Olmsted v. Saint Paul Pub. Sch.*, 830 F.3d 824, 828 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). The court "view[s] the record in the light most favorable to the nonmoving party and

---

[3] A factfinder could find the fourth Callisto order was a sideways transaction based on Sterler's affidavit stating that "[t]here are no orders for [Callisto] on [North Liberty's] Product Purchase History" (NL Prior App. 36), in combination with other evidence generally showing Hart billed North Liberty for products ordered by third parties.

draw[s] all reasonable inferences in that party's favor." ***Soo Line R.R. Co. v. Werner Enters.***, 825 F.3d 413, 418 (8th Cir. 2016) (quoting ***Bishop v. Glazier***, 723 F.3d 957, 960-61 (8th Cir. 2013)).

In diversity cases applying state law, the court is bound by decisions of the state's highest court. ***Williams v. Nat'l Med. Servs., Inc.***, 400 F.3d 1102, 1104 (8th Cir. 2005). "Although federal courts are not bound to follow the decisions of intermediate state courts when interpreting state law, state appellate court decisions are highly persuasive and should be followed when they are the best evidence of state law." ***Baxter Int'l, Inc. v. Morris***, 976 F.2d 1189, 1196 (8th Cir. 1992). Here, the parties primarily cited to Iowa law, although Simplot also included a few citations to Tennessee law. At oral argument, Simplot agreed that resolution of the motion for summary judgment would be the same under Tennessee law as under Iowa law. Accordingly, I analyze the claims under only Iowa law.

### A. Fraud

Simplot moves for summary judgment on North Liberty's fraud claim, arguing that North Liberty cannot prove justifiable reliance. "Justifiable reliance is an essential element of a claim for fraud" under Iowa law—that is, "the plaintiff must not only act in reliance on the misrepresentation, but the reliance must be justified." ***Spreitzer v. Hawkeye State Bank***, 779 N.W.2d 726, 736 (Iowa 2009). "Justified reliance" differs from "reasonable reliance" in that "the reliance does not necessarily need to conform to the standard of a reasonably prudent person, but depends on the qualities and characteristics of the particular plaintiff and the specific surrounding circumstances." ***Id.*** at 736-37. Nevertheless, a plaintiff must "use his senses, and cannot . . . blindly rel[y] on a misrepresentation" when "a cursory examination or investigation" would reveal its obvious falsity. ***Dier v. Peters***, 815 N.W.2d 1, 9 (Iowa 2012) (quoting ***Lockard v. Carson,*** 287 N.W.2d 871, 878 (Iowa 1980)). In the context of financial transactions,

6

the Iowa Supreme Court has identified the following factors to consider when determining whether reliance was justified:

> (1) the sophistication and expertise of the plaintiff in financial matters; (2) the existence of long-standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Spreitzer*, 779 N.W.2d at 737 (cleaned up) (quoting *Davidson v. Wilson*, 973 F.2d 1391, 1400 (8th Cir. 1992)).

Simplot argues that North Liberty cannot prove justifiable reliance because for most of the sideways transactions, Hart did not ask for North Liberty's approval, and North Liberty did not realize the sideways transactions were occurring. Thus, Simplot argues that North Liberty did not rely on Hart's misrepresentations because it took no action (or inaction) as a result of the sideways transactions.

North Liberty responds that its fraud claim sounds in Simplot's deception in administering North Liberty's account, charging North Liberty for products it did not order (as a result of the sideways transactions) without obtaining Vogt's consent or providing North Liberty with rebates as promised. North Liberty points to factors supporting that its reliance was justified, but it does not explain how it relied on Hart's misrepresentations. At oral argument, North Liberty argued that its continued business with Simplot was in reliance on Hart's misrepresentations. But North Liberty could not point to any evidence that it would have stopped doing business with North Liberty if it had known about the sideways transactions. Even when given the chance to submit additional citations to the record, North Liberty points only to general evidence of how rebates worked and that sideways transactions occurred, as well as Vogt's affidavit in which he averred "[he] agreed to [Hart's] proposition [about using North Liberty's account for sideways transactions] but required that Hart obtain [his] consent before each product shipment." NL Prior App. 1-2, 42-43; Simplot App. 289-91. Vogt did not state

7

that absent Hart's misrepresentations, he would not have agreed to the use of North Liberty's account for sideways transactions or stopped doing business with Simplot. As North Liberty has offered no evidence of reliance, Simplot is entitled to summary judgment on North Liberty's fraud claim.

### B. *Negligent Misrepresentation*

Simplot argues that North Liberty's negligent-misrepresentation claim fails because Simplot is in the business of selling agriculture-related products, not the business of supplying information. I agree. Under Iowa law, "[w]here the defendant is not in the business of supplying information, and the parties deal at arm's length in a commercial transaction," the defendant owes no duty of care and cannot be liable for negligent misrepresentation. *Fry v. Mount*, 554 N.W.2d 263, 265 (Iowa 1996). Negligent misrepresentation under Iowa law "predominately applies to situations where the information supplied harmed the plaintiff in its relations with third parties," not where the "information harm[ed] the plaintiff in the transaction with the defendant." *Sturm v. Peoples Tr. & Savs. Bank*, 713 N.W.2d 1, 5 (Iowa 2006) (quoting *Sain v. Cedar Rapids Cmty. Sch. Dist.*, 626 N.W.2d 115, 126 (Iowa 2001)). Thus, the Iowa Supreme Court has recognized that accountants, abstractors, appraisers, lawyers, investment brokers, and school guidance counselors may be liable for negligent misrepresentation, as they are in the business of supplying information, but no liability lies based on misrepresentations by a seller during the sale of a business, a retail seller, or a bank officer during a loan negotiation. *See Fry*, 554 N.W.2d at 265-66; *Sain*, 626 N.W.2d at 126.

Here, Simplot is not in the business of supplying information.

> [M]anufacturers and dealers of merchandise have not generally been considered to be in the business of supplying information. Their businesses involve making, selling and servicing products, and any information provided during the course of the business is incidental.

8

*Fry*, 554 N.W.2d at 266 (quoting *Greatbatch v. Metro. Fed. Bank*, 534 N.W.2d 115, 117 (Iowa Ct. App. 1995)).  Accordingly, Simplot is entitled to summary judgment on North Liberty's negligent-misrepresentation claim.

### C. Breach of Contract:  Credit Application Agreement

The Credit Application Agreement contains a forum-selection clause, providing "that all issues and disputes relating to any credit extended . . . will be settled, solely and exclusively, by litigation. . . . in the state and federal courts located in Shelby County, Tennessee."  Simplot App. 51.  North Liberty's breach-of-contract claim based on the Credit Application Agreement relies on the forum-selection clause.  North Liberty argues that by filing suit in this court rather than in Tennessee, Simplot breached the Credit Application Agreement.

> [W]hile a forum selection clause serves to waive any challenge to personal jurisdiction in those jurisdictions named in the contract, it does not "eliminate *another* state's ability to exercise personal jurisdiction over a party to such a contract." Instead, a party's means of enforcing a forum selection clause has been addressed by courts as a concern of venue.

*High Plains Constr., Inc. v. Gay*, 831 F. Supp. 2d 1089, 1097 (S.D. Iowa 2011) (cleaned up) (quoting *Brown v. Kerkhoff*, 504 F. Supp. 2d 464, 502 n.28 (S.D. Iowa 2007)).  A party waives a defense of improper venue by failing to raise it in a timely manner.  *See* **Fed. R. Civ. P. 12(h)(1)**.  Thus, "summary judgment is [not] an appropriate vehicle to enforce a forum[-]selection clause."  *BVS, Inc. v. CDW Direct, LLC*, 88 F. Supp. 3d 948, 975 (N.D. Iowa 2015).

Here, North Liberty did not raise the issue of the forum-selection clause until filing its amended answer and counterclaim in December 2019, a year and a half into the litigation.  North Liberty has forfeited any challenge to this case being heard in the Northern District of Iowa, and North Liberty cannot rely on the forum-selection clause to form its breach-of-contract claim.  Accordingly, Simplot is entitled to summary

9

judgment on North Liberty's breach-of-contract claim based on the Credit Application Agreement.[4]

### D. Breach of Contract: Invoices/Finance Charges

North Liberty alleges a breach-of-contract claim based on Simplot charging an interest rate of 1.5% per month, or 18% per year. The Credit Application Agreement provides that "a service charge of one and one half percent (1.50%) per month, the interest rate stated in Exhibit 'A', or the highest legal rate, whichever is appropriate, may be assessed on delinquent invoices." Simplot App. 51. The invoices sent by Simplot did not state the interest rate to be charged in the event of a late payment, but Simplot's monthly statements stated: "Our finance charge is computed at a periodic rate of 1.50% per month, which is an annual percentage rate of 18.00%. The charge is applied to the adjusted balance, which is the balance for the previous month, less payments for the current month." Simplot SOF ¶ 24; NL Resp. SOF ¶ 24; *see also, e.g.*, Simplot App. 81-82. North Liberty argues that Simplot breached its contract with North Liberty by attempting to "collect[] . . . finance charges of 1.5% (18% per annum)" in this litigation, when Hart "negotiated to charge a nine percent" finance charge annually. Doc. 71 at 34-35.[5]

North Liberty offers no evidence that at the time of purchase or the contract formation, Hart promised to charge North Liberty only 9% interest on its purchases. Instead, as Simplot points out, North Liberty's evidence establishes that in an effort to obtain payment from North Liberty, Hart agreed to accept less than the interest charge actually owed (9% interest instead of 18%). *See* NL App. 13-14 (Simplot credit manager

---

[4] North Liberty raises other arguments to support that the Credit Application is unenforceable and that Simplot's claims must fail, but the validity of Simplot's claims is not at issue as neither party moved for summary judgment on Simplot's claims.

[5] Simplot notes that North Liberty's summary-judgment resistance is the first time that North Liberty has set forth this theory of its interest-rate breach-of-contract claim.

testified that Hart "would negotiate interest rates down 50 percent"; that Simplot "left them at 18 percent APR, and [Hart] would say, if I can get 9 percent from him, are you okay with that, and most of the time I was"; and that Hart "negotiated an interest rate of 9 percent rather than 18 percent" on the North Liberty account); NL App. 76 (email chain from December 2017 in which Simplot employees are discussing the past due amount on North Liberty's account, and when someone asks Hart whether he plans "on holding [North Liberty] to . . . all of the finance charges," Hart responds, "No we have in past charge them 9"; based on Hart's response, the Simplot employee noted "at best," Simplot "will end up charging off half of the [finance charges]," and North Liberty "will be responsible for the rest"); NL App. 39 (Simplot sales manager discussed December 2017 email chain and noted Simplot's "normal finance charge rate is 18 percent APR, and [the email chain] is about the past due amount and that we would write off half, or 9 percent, of the finance charges"). That Simplot offered to settle the debt by accepting less than what it is owed does not establish that Simplot breached a contract by now seeking the full amount owed. There is no evidence of a valid contract between Simplot and North Liberty where Simplot agreed to collect only 9% interest from North Liberty; any such promises by Simplot were in an attempt to obtain payment from North Liberty and lack consideration. Accordingly, Simplot is entitled to summary judgment on North Liberty's breach-of-contract claim involving interest rates.

### E. Breach of Contract: Rebates

North Liberty's final breach-of-contract claim is based on Simplot's failure to credit its account for rebates. Simplot moves for summary judgment on this claim, arguing that North Liberty has failed to provide sufficient evidence that a contract existed requiring the payment of rebates.

The evidence establishes several different types of rebates exist in the parties' line of work. First, there are manufacturer's rebates provided by the manufacturer of the product, which Simplot, dealers like North Liberty, and the ultimate consumer may all

11

be entitled to. NL App. 16. Simplot and North Liberty both independently negotiated with the manufacturer for the rebate they would receive based on product purchase price and sales volume (although in North Liberty's case, this negotiated amount was on top of a standard amount that applied to all dealers). *Id.*; Simplot App. 290. There is no evidence of this negotiated percentage or how the manufacturer's rebate was calculated for either Simplot or North Liberty. *See* NL App. 16.[6]

The manufacturer also provided Simplot a "competitive allowance," which Simplot passed on to dealers like North Liberty. NL App. 25. Simplot usually provided a rebate check or credit to the dealer's account each December for the competitive allowance, but sometimes, the competitive allowance was taken off the purchase price up front. NL App. 25-26. The competitive allowance that a dealer received from Simplot varied from 2.5% to 20% of a product's purchase price and was determined based on product and sales volume. NL App. 25-26; Simplot App. 289. Hart negotiated the amount of the competitive allowances with North Liberty. *See* NL App. 17. The Simplot credit manager who prepared North Liberty's account statement testified that he did not know how competitive allowances were calculated, but a different department provided him dollar amounts to include as competitive allowances on the account (without explaining what products the competitive allowances were tied to or how they were calculated). *Id.* He indicated that department would have received information from Hart regarding how to calculate competitive allowances. *Id.*

North Liberty contends that Simplot owes it rebates for sideways transactions, as well as for products ordered by North Liberty. With regard to the former, Vogt indicated in a June 2019 affidavit that Hart used the Simplot account for sideways transactions "to increase the rebates [to Simplot] from the product manufacturer" and agreed that North

---

[6] Handwritten calculations by Vogt, which will be discussed later, list manufacturers' names and percentages for certain products, but there is no testimony or other evidence establishing why Vogt used these percentages (i.e., no evidence establishes that these percentages were the negotiated amounts). *See* Simplot App. 177, 210-11.

Liberty "would receive a portion of the enhanced rebates from each 'sideways transaction'" for use of its account. NL Prior App. 1. Other evidence supports the parties' understanding that North Liberty would receive compensation in the form of rebates for the use of its account for sideways transactions. *See* NL Prior App. 98; NL App. 25, 33-34. But there is no evidence that Hart promised to pay North Liberty a certain percentage of the enhanced manufacturer's rebates or that the parties otherwise agreed how North Liberty would be compensated for the use of its account—only that it would.

To prove a breach-of-contract claim under Iowa law, the plaintiff must show "(1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach." *Iowa Mortg. Ctr., L.L.C. v. Baccam*, 841 N.W.2d 107, 111 (Iowa 2013) (quoting *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998)). The terms of an oral contract "are sufficiently definite if the court can determine with reasonable certainty the duty of each party and the conditions relative to performance." *Severson v. Elberon Elevator, Inc.*, 250 N.W.2d 417, 420 (Iowa 1977). "The terms of a contract are reasonably certain if they provide a basis for determining existence of a breach and for giving an appropriate remedy." *Palmer v. Albert*, 310 N.W.2d 169, 172 (Iowa 1981) (quoting **Restatement (Second) of Contracts § 32(2) (Tent. drafts Nos. 1-7)** (1973)).[7] Only the essential terms of the contract must be reasonably certain, *see Severson*, 250 N.W.2d at 420; "minor details of the contract need not be proven in the first instance in order to present the issue for the trier of fact," *Netteland v. Farm Bureau Life Ins. Co.*, 510 N.W.2d 162, 165-66 (Iowa Ct. App. 1993) (citing *Fortgang Bros., Inc. v. Cowles*, 85 N.W.2d 916, 919 (Iowa 1957)). On the one hand, "[w]here a contract appears to exist, courts are reluctant to find it too uncertain to

---

[7] The draft version of the Second Restatement quoted by the court was finalized as section 33.

13

be enforceable"; but on the other, "when the terms are not definite, courts are reluctant to impose reasonable terms on contracting parties." *Gallagher, Langlas & Gallagher v. Burco*, 587 N.W.2d 615, 617 (Iowa Ct. App. 1998); *see also Palmer*, 310 N.W.2d at 172 ("Courts are reluctant to hold a contract unenforceable for uncertainty and they bend every effort to avoid such a result." (citing 1 **S. Williston, A Treatise on the Law of Contracts § 37** (3d ed. W. Jaeger 1957))); *Faulkner v. Des Moines Drug Co.*, 90 N.W. 585, 586 (Iowa 1902) ("The law does not favor, but leans against, the destruction of contracts because of uncertainty; but, when contracts are so vague and indefinite in terms that the intention of the parties cannot be fairly and reasonably collected from them, the courts will not undertake to give them effect.").

Vogt and Sterler submitted affidavits in June 2019 averring that Simplot owed North Liberty $295,539.05 in rebates related to sideways transactions. NL Prior App. 2, 37. In those affidavits, they did not explain how they calculated those numbers: Vogt's affidavit stated the prices of the products involved in the sideways transactions but did not identify the amount of rebate tied to each product, except noting that Simplot owed $124,000 for the $381,000 sideways transaction involving Status. NL Prior App. 2-3. Vogt submitted handwritten calculations in discovery that concluded the amount of rebate owed for sideways transactions was $335,502 (a different number than stated in his affidavit). Simplot App. 177, 210-11. For each sideways transaction, he noted the percentage amount the manufacturer and Simplot owed North Liberty for the purchase, as well as noting percentages owed by other entities (their relation to the product unexplained) and percentages based on rebates owed to the ultimate consumer. *Id.* A discovery response submitted in April 2020 reaffirmed these handwritten calculations and indicated North Liberty sought manufacturer's rebates from Simplot because North Liberty "cannot collect the rebates from the manufacturers because these transactions were not known to [North Liberty] until the time for collecting the rebates had passed." Simplot App. 211.

It is not entirely clear where Vogt obtained the percentages used in his handwritten calculations of the amount of rebates owed for sideways transactions (nor why the total listed in his handwritten calculation differs from his affidavit). The court's best guess is that Vogt calculated the rebates for the sideways transactions as if North Liberty had made a direct purchase, seeking Simplot to pay (1) the manufacturer's rebate that North Liberty would have received from the manufacturer, (2) the competitive allowance that North Liberty would have received from Simplot, and (3) rebates North Liberty's customers would have received. But there is no evidence that Simplot agreed to provide North Liberty with the same kind of rebates for sideways transactions as it did for direct purchases. Indeed, Vogt's affidavit states that the agreement was for Simplot to provide North Liberty with "a portion" of the enhanced manufacturer's rebate that *Simplot* would receive as a result of the sideways transactions. NL Prior App. 1. Vogt's calculations do not appear based on any enhanced manufacturer's rebate obtained by Simplot. The evidence does not establish a contract existed requiring Simplot to pay North Liberty the amounts set forth in Vogt's and Sterler's affidavits and in Vogt's handwritten calculation.

But there is evidence that Hart (a Simplot representative) promised to provide North Liberty rebate money in exchange for using North Liberty's account for sideways transactions. There is also evidence that Simplot provided rebates to North Liberty for some of the sideways transactions: in March 2018, when Simplot attempted to rectify North Liberty's account, Simplot included credits to North Liberty's account for rebates on the Sharpen, Status, and Quadris orders. *See* Simplot App. 238-39. That email notes that for the Sharpen and Status orders, North Liberty had been charged $427,485; a check from a third party had been applied to North Liberty's account for those orders in the amount of $295,560; the "check was . . . given a discount . . . in the amount of [$]13,617.70[,] which was" North Liberty's "rebate" for the two orders; and the North Liberty account would be credited $131,925 for the remaining purchase price of the orders. Simplot App. 238. The third-party check and account credit totaled the purchase price; the $13,617.70 "discount" to the check appears to be North Liberty's rebate for

15

the use of its account (about 4.6% of the amount paid by the third party and about 3.2% of the total purchase price). For the Quadris order, the March 2018 email notes that North Liberty was charged $42,525, which was credited to North Liberty's account the previous month, and that North Liberty would be given a 3% rebate of $1,275.75. Simplot App. 238-39. For the Castillo sideways transactions, however, there is no evidence that North Liberty received any sort of rebate or compensation for the use of its account.

The Iowa Supreme Court has held that when it is clear the parties entered into a contract, but the terms and conditions of that agreement were not entirely clear at first, the factfinder may look to the parties' course of conduct in determining the terms and conditions of the contract. *See Hilgenberg v. Iowa Beef Packers, Inc.*, 175 N.W.2d 353, 354-56 (Iowa 1970) (when employer promised to pay employees an annual bonus, without specifying how the bonus would be calculated, and the employer paid the bonus once and thereafter refused, the court held sufficient evidence supported plaintiff employees' breach-of-contract claim based on evidence that the employer previously paid the bonus from a set-aside bonus fund, and the employer had allocated more than $14,000 to that fund the year it refused to pay the bonuses); *see also Langer v. Iowa Beef Packers, Inc.*, 420 F.2d 365, 370 (8th Cir. 1970) (applying Iowa law) (holding that when defendant employer promised to pay employee an annual bonus based on the employee's performance and the defendant's profitability, a jury could determine the amount of the bonus based on evidence that the employer paid a bonus to the employee in prior years and that the employer paid other employees a bonus in the disputed year, in addition to evidence of employee salaries and defendant's profitability in all years in which it paid a bonus); *cf. Drake v. Block*, 74 N.W.2d 577, 580-81 (Iowa 1956) (noting "in the absence of an agreement as to a definite amount," the terms of a promise could be established by "conduct between the parties over an appreciable period of time which shows a certain degree of continuity or pattern"; but holding that employer's promise to pay bonus was too indefinite to be enforceable when the parties did not agree to the timing or amount of

16

the bonuses, and the employer's past conduct established "a hit or miss method unknown and unfathomable to all except the employer"). Here, to allow North Liberty's breach-of-contract claim to proceed would not result in "a verdict based upon pure conjecture," *Drake*, 74 N.W.2d at 581; rather, a factfinder could determine the amount of rebate Simplot owes North Liberty for the use of its account for the Castillo sideways transactions based on evidence that Simplot provided a rebate between three and four percent of the purchase price on the other sideways transactions.[8] The terms and conditions of the oral contract between the parties are not too vague to be enforced.

Simplot makes other arguments, all of which miss the mark. Simplot argues that by definition, a "rebate" is paid when a customer orders a product, and it is undisputed that third parties ordered the products involved in the sideways transactions. Simplot ignores the evidence that Hart promised to pay Vogt what he called a "rebate" for the use of North Liberty's account for sideways transactions. Simplot also argues that because there is no evidence of the amount of enhanced rebate it received as a result of the sideways transactions, the "portion" of that rebate owed to North Liberty cannot be determined. But there is evidence that the manufacturer's rebate received by Simplot was based in part on product purchase price, and there is evidence that Simplot compensated North Liberty for three of the sideways transactions based on product purchase price; this is sufficient. Finally, Simplot argues that the Uniform Commercial Code bars North Liberty's claims, but the sideways transactions did not involve the purchase of goods by North Liberty; rather, they involved the use of North Liberty's account (for the purchase of goods by third parties). Simplot is not entitled to summary

---

[8] It is unclear to the court whether the rebates were actually provided to North Liberty as the March 2018 email states. Although these rebates appear in the "credit" column on the initial account summary attached to the complaint, the amount in the "total" column remains the same on these entries. *See* Simplot App. 229, 231. In addition, the $1,275.75 rebate appears on the most recent account summary, but not the $13,617.70 rebate. *See* Simplot App. 48. In any event, the March 2018 email from Simplot provides sufficient evidence from which to determine the amount of the rebates owed.

17

judgment on North Liberty's breach-of-contract claim related to rebates for the sideways transactions.

North Liberty also seeks to base its rebate breach-of-contract claim on products it ordered from Simplot (as distinguished from products involved in sideways transactions). Most of North Liberty's relied-upon evidence relates to the sideways-transaction rebates, not rebates for products ordered by North Liberty. With regard to the latter, North Liberty's evidence consists of (1) general evidence that Simplot provides North Liberty competitive allowances for its purchases; (2) an email from October 2017 in which Hart acknowledged he was behind in calculating rebates owed to North Liberty; (3) emails from December 2017 reflecting Vogt complained that Simplot still owed rebates; (4) a Simplot sales manager's December 2017 email requesting "dealer rebates" for North Liberty from Hart on a list of products, noting it was especially important "with deadlines approaching";[9] and (5) blanket statements by Vogt and Sterler in June 2019 that Simplot owes a certain amount of money for competitive allowances. NL Prior App. 33, 93-94, 99. North Liberty has not offered sufficient evidence of the terms and conditions of any contract to pay competitive allowances. In addition, there is no evidence that Simplot failed to pay competitive allowances. North Liberty points to deposition testimony in which Simplot's account manager indicated he did not know how competitive allowances were calculated, but he testified that he included such allowances in his calculations based on numbers he received from a different department. NL App. 17. Vogt's and Sterler's affidavits set forth the total amount of competitive allowance owed without explaining how they calculated those numbers or what products the competitive allowance related to. NL Prior App. 4, 36-37. And a Simplot employee explained in March 2018 that the competitive allowances Vogt and Sterler had previously questioned were invoiced with

---

[9] At his deposition, the sales manager indicated that Hart never responded with the competitive allowances Simplot was "going to offer to [North Liberty]," that he did not know if North Liberty ordered any products listed in the email or received rebates, and that he asked Hart for dealer rebates "[t]o offer those to [North Liberty] to" try to make a sale. NL App. 33.

the competitive allowance taken off up front. Simplot App. 238. The evidence does not establish what competitive allowances Simplot owed North Liberty, and it does not establish that Simplot failed to pay any of these competitive allowances. Any award of competitive allowances for direct purchases would be "pure conjecture." *Drake*, 74 N.W.2d at 581.

I **deny** summary judgment to Simplot on North Liberty's breach-of-contract claim related to sideways-transaction rebates. I **grant** summary judgment to Simplot on North Liberty's breach-of-contract claim related to direct-purchase rebates.

### F. Unjust Enrichment

North Liberty's unjust-enrichment claim is based on the same facts as its rebate breach-of-contract claim: it argues that Simplot's receipt of enhanced manufacturer's rebates as the result of billing North Liberty's account for sideways transactions amounts to unjust enrichment. Under Iowa law, unjust enrichment requires proof (1) that the "defendant was enriched by the receipt of a benefit;" (2) that "the enrichment was at the expense of the plaintiff;" and (3) that "it is unjust to allow the defendant to retain the benefit under the circumstances." *State Dep't of Human Servs. ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 154-55 (Iowa 2001).

Simplot argues there is no evidence it was enriched by the sideways transactions. Vogt's affidavit noted Simplot's purpose in using North Liberty's account for sideways transactions was to increase the rebates Simplot received from manufacturers. But other than this general statement, North Liberty can point to no evidence that Simplot actually received enhanced manufacturer's rebates as a result of the sideways transactions, nor what the amount of those rebates were.

Even if North Liberty's general evidence sufficiently establishes Simplot received a benefit, Simplot argues North Liberty cannot prove the enrichment was at North Liberty's expense. North Liberty ignored this argument in its resistance, but at oral argument, North Liberty responded that Simplot's receipt of enhanced manufacturer's

19

rebates occurred at its expense because Simplot used its account and North Liberty was supposed to receive part of the benefit. North Liberty recognized that Simplot's receipt of higher rebates was primarily at the expense of the manufacturers who paid the rebates but argued that it was also harmed. I disagree. Simplot's receipt of a higher rebate from the manufacturers did not affect North Liberty and its ability to obtain rebates in any manner. Although it could be argued that North Liberty was affected by the (sloppy) use of its account, resulting in increased finance charges and other issues, North Liberty does not make this argument. Rather, North Liberty essentially argues that because the parties agreed North Liberty would receive a portion of the rebate, Simplot keeping the entire rebate is at North Liberty's expense, and North Liberty should receive a portion of the rebate. This is essentially a contract claim couched as an unjust-enrichment claim, and the oral contract here governs North Liberty's recovery, rather than a theory of unjust enrichment. *See EAD Control Sys., LLC v. Besser Co. USA*, No. C 11-4029-MWB, 2012 WL 2357572, at *3 (N.D. Iowa June 19, 2012) ("[O]nce a court determines that an express contract exists between the parties as to the subject matter at issue in the unjust enrichment claim, the unjust enrichment claim fails as a matter of law because an express and implied contract may not coexist as to the same subject matter.").

Accordingly, Simplot is entitled to summary judgment on North Liberty's unjust-enrichment claim.

### G. Breach of the Implied Covenant of Good Faith and Fair Dealing

Simplot argues it is entitled to summary judgment on North Liberty's claim of breach of the implied covenant of good faith and fair dealing because Iowa law does not recognize such a claim as an independent cause of action, and because the complained-of actions have either been rectified or were permitted under the Credit Agreement. Under Iowa law, "[a]n implied duty of good faith and fair dealing is recognized in all contracts," but this "covenant does not 'give rise to new substantive terms that do not otherwise exist in the contract.'" *Bagelmann v. First Nat'l Bank*, 823 N.W.2d 18, 34

20

(Iowa 2012) (quoting *Mid-Am. Real Estate Co. v. Iowa Realty Co.*, 406 F.3d 969, 974 (8th Cir. 2005)). "Instead of creating new substantive obligations, the covenant prevents one party from using technical compliance with a contract as a shield from liability when that party is acting for a purpose contrary to that for which the contract was made." *Mid-Am. Real Estate*, 406 F.3d at 974. "The underlying principle is that there is an implied covenant that neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Alta Vista Props., LLC v. Mauer Vision Ctr., PC*, 855 N.W.2d 722, 730 (Iowa 2014) (quoting *Am. Tower, L.P. v. Local TV Iowa, L.L.C.*, 809 N.W.2d 546, 550 (Iowa Ct. App. 2011)). The implied covenant "give[s] the parties what they would have stipulated for at the time of contracting if they could have foreseen all future problems of performance." *Am. Tower*, 809 N.W.2d at 550 (quoting 13 Richard A. Lord, *Williston on Contracts* § 38.15 (4th ed. Supp. 2011)). The implied covenant must "follow[] logically from [an] express term[] of the agreement"; in other words, the claim fails if there is no contract term to which the implied covenant "can be attached," even if the other party to the contract acted in bad faith. *Alta Vista Props.*, 855 N.W.2d at 731.

So, for example, the Iowa Supreme Court has held that a rental agreement that contained a clause allowing a landlord to sell the property at any time "implicitly include[d] the right [of the landlord] to show [the property] to prospective purchasers." *Id*. In that case, the court also favorably discussed an example from the Second Restatement of Contracts:

> If A, the owner of a shopping center, were to lease part of the premises to B with the exclusive right to conduct a supermarket, it would be a breach of the implied duty of good faith and fair dealing for A to acquire the adjoining land and lease it to C to run a competing supermarket. Although leasing the adjoining land to C would not literally violate the express terms of A's lease with B, it would nevertheless constitute a breach of contract by implication for violating the obligation of good faith and fair dealing. The point is: The *express* right to operate the only supermarket on the premises carries with it the *implied* right not to have the landlord go into competition next door.

21

*Id.* at 730-31 (citations omitted) (citing **Restatement (Second) of Contracts § 205**, illus. 2 (Am. Law Inst. 1981)). Other examples in which Iowa courts have found a breach of the covenant of good faith and fair dealing include (1) where plaintiff performed billing services for defendant and was paid based on a portion of the recovered bill, and defendant stopped collection efforts on old unpaid accounts, **Team Two, Inc. v. City of Des Moines**, No. 12-1565, 2013 WL 1749909, at *5 (Iowa Ct. App. 2013); (2) where defendant stole a business plan from plaintiff, its customer and distributor, and refused to ship prepaid products to plaintiff until the plaintiff signed a new distribution contract, **Vlieger v. Farm for Profit, Research & Dev., Inc.**, No. 04-876, 2005 WL 1963002, at *2-3 (Iowa Ct. App. 2005); (3) where defendant falsely claimed that repairs were not satisfactory and that time was of the essence in an effort to obtain the property at less than the agreed-upon purchase price, **Slashfrog, LLC v. Quick**, No. 19-0031, 2019 WL 6358193, at *1, *4-5 (Iowa Ct. App. 2019); and (4) where plaintiff leased space from defendant for the use of a third party, and defendant ultimately contracted with the third party directly for the space, cutting plaintiff out of the deal, **MYA Logistics, LLC v. Phoenix Newton LLC**, No. 4:18-CV-00249-SBJ, 2019 WL 7500245, at *4, *7-10, *15 (S.D. Iowa Oct. 16, 2019). In addition, the Eighth Circuit suggested that the covenant would be violated when a contract required the defendant claims-processing company to transfer files to a new claims-processing company upon the plaintiff's request, and the defendant transferred the files "in such a manner as to render the files unusable"; but the court held the transfer-files contractual provision did not impose a broad duty to ensure a smooth transition to the new claims-processing company, and the covenant was not violated when the defendant sued its former employees who had left to form the new claims-processing company, "even if such litigation disrupt[ed] their work on behalf of [the plaintiff]." **Countrywide Servs. Corp. v. SIA Ins. Co.**, 235 F.3d 390, 392-94 (8th Cir. 2000) (applying Missouri law; favorably cited by the Eighth Circuit when discussing Iowa law in *Mid-America Real Estate*).

On the other hand, the Iowa Supreme Court held that a contractual provision in a mortgage allowing the defendant to charge the plaintiff for a flood-zone determination did not obligate the defendant to perform the flood-zone determination accurately, nor to inform the plaintiff when defendant discovered the inaccuracy of the flood-zone determination, because both the mortgage and the flood-zone determination explicitly stated the flood-zone determination was solely for defendant's use and benefit, not plaintiff's. *Bagelmann*, 823 N.W.2d at 33. The court also rejected an implied-covenant claim in *Albaugh v. The Reserve*, 930 N.W.2d 676, 686-87 (Iowa 2019). In that case, to live in a senior living apartment, the plaintiff had to pay a $60,000 "entrance fee" as well as monthly rent. *Id.* at 679. The contract provided that the plaintiff's ability to recover the entrance fee upon moving out would "depend entirely" on the plaintiff's ability to transfer her interest to another person. *Id.* at 680. By the time plaintiff moved out, defendant had changed the structure of its business, so a person could lease an apartment without paying an entrance fee or could pay a much lower entrance fee to obtain an apartment. *Id.* at 681. The plaintiff argued that this violated the implied covenant of good faith and fair dealing, because it made it much harder for her to transfer her interest to another person willing to compensate her for the "entrance fee" she had paid. *Id.* at 686. The court held "[n]othing in the agreement suggested the [defendant] would enable [plaintiff] to recover her entrance fee"; rather, it explicitly stated the plaintiff's ability to recover this fee would depend on her ability to transfer her interest in the apartment. *Id.* at 687. Finally, in *Mid-America Real Estate*, the Eighth Circuit held that defendant realtor did not breach an implied covenant with another realtor when they had contracted to share listings entered into a particular database, and the defendant solicited office-exclusive listings that would not be entered in that database. 406 F.3d at 975. The court noted "the contract d[id] not support a justified expectation about the percentage of [defendant's] listings to be stored on the database" and required only non-office-exclusive listings to be entered in the database. *Id.* at 975-76.

Case 5:18-cv-04047-KEM   Document 89   Filed 10/27/20   Page 23 of 28

Here, North Liberty identified eight of Simplot's actions that it argues constituted a breach of the implied covenant of good faith and fair dealing:

- billing North Liberty for products that were not shipped to or received by North Liberty;
- charging finance charges for products that were not shipped to or received by North Liberty;
- generating "dummy" invoices for "sideways" transactions;
- failing to credit North Liberty's account for rebates resulting from "sideways" transactions;
- failing to credit North Liberty's account for rebates resulting from North Liberty's purchase of agronomy products from Simplot;
- charging finance charges in excess of those negotiated by Hart;
- failing to reconcile issues regarding North Liberty's account despite repeated requests from North Liberty; and
- concealing transactions from North Liberty and Vogt.

As discussed in prior sections, not all of these allegations are supported by the evidence. But the evidence does support that Simplot knowingly charged North Liberty for the purchase price and accrued finance charges for products neither ordered by nor delivered to North Liberty. Moreover, when North Liberty questioned the charges, Simplot failed to explain or correct North Liberty's account for more than six months—despite Hart being informed of the problem and knowing full well what had happened with North Liberty's account. I find that Simplot knowingly overbilling North Liberty is precisely the kind of conduct the implied covenant of good faith and fair dealing is designed to protect against.

Simplot argues that there is no contractual term to which the implied covenant can attach. The Credit Agreement contemplates that North Liberty will pay the invoiced sum "[f]or value received." Simplot App. 51. For the sideways transactions, Simplot charged North Liberty, despite North Liberty receiving nothing of value. Similarly, under the agreement in place between the parties prior to entering the Credit Agreement (oral or otherwise), the parties contemplated that Simplot would bill North Liberty only for products it ordered and received. *See* Simplot App. 56 (monthly statements from 2016

24

indicate that "Buyer taking possession of the goods . . . constitutes agreement to the[] terms and conditions" in the monthly statements). Even though the contract does not explicitly state that Simplot will not bill North Liberty for products it did not order, such a clause "follows logically" from the agreement between the parties and does not give rise to "new substantive terms"—it was understood at the time of contracting that Simplot would bill North Liberty only for products North Liberty ordered, and both parties would have readily agreed to a clause saying as much at the time of contracting.

Simplot argues that North Liberty's implied-covenant claim is barred by the following provision in the Credit Agreement:

> Customer agrees to examine immediately upon receipt each of Creditor's invoices and statements, and to advise Creditor of any disputed transactions within 10 days of receipt. . . . To the fullest extent permitted by applicable law, failure to notify Creditor of any dispute with respect to defective goods or billing will constitute a waiver of all such disputes.

Simplot App. 51. Although this clause could prevent North Liberty from bringing a breach-of-contract claim, Simplot cannot use "technical compliance with a contract" as a shield from liability under the implied duty of good faith and fair dealing. *Mid-Am. Real Estate*, 406 F.3d at 974. At the time of contracting, the parties likely understood this clause to require North Liberty to notify Simplot within ten days if goods were defective, if Simplot charged North Liberty the wrong price, or other problems of that nature—they did not contemplate that Simplot could knowingly charge North Liberty for products ordered by third parties, and if North Liberty did not catch it in time, it was on the hook for the purchase price and all accrued finance charges. Indeed, that Simplot credited North Liberty's account for most of the sideways transactions—despite being notified of the disputed charges months and even years after the initial transactions—supports this interpretation of the parties' understanding.[10] The

---

[10] I also note that any dispute related to competitive-allowance rebates could not be made within ten days, as Simplot generally did not credit North Liberty's account for such rebates until the

analogous ten-day objection provision in the monthly statements lends further support, as it provides that the parties agree "10 days is a reasonable period for inspection of the goods and to deliver a notice of claim" and that "[f]ailure to give notice of a claim within 10 days . . . will constitute a waiver by Buyer of all claims." Simplot App. 56. Simplot's reliance on the ten-day objection provision is somewhat similar to a voluntary-payment defense, which courts have held does not apply when the plaintiff failed to discover an overcharge because of the defendant's misrepresentations. *See Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 983 A.2d 652, 662 (Pa. 2009); *see also State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 32 (Iowa 2013) (noting Iowa does not recognize the voluntary-payment doctrine, but even if it did, it would not apply in cases involving fraud). There is evidence that Simplot knowingly (through Hart) charged North Liberty for the purchase price and related finance charges for products ordered by third parties, representing to North Liberty on its monthly statements that the products had been delivered to North Liberty (along with a long list of other products North Liberty had actually received). A factfinder could find Simplot acted in bad faith, and Simplot cannot rely on North Liberty's failure to discover the overbilling within the ten-day objection provision.

The case relied upon by Simplot, *American Tower*, is distinguishable. In that case, the rental contract between the parties provided that the defendant would obtain the necessary permits, which the court noted would normally require the defendant to act in good faith to obtain the permits. 809 N.W.2d at 550. The court held, however, that the plaintiff's implied-covenant claim failed, despite the defendant's failure to take any action to try to obtain the permits, because the contract specifically provided that if the defendant failed to obtain a permit "due to [its] fault or . . . failure to act," then the defendant

---

end of the year. This suggests that the Credit Agreement was not the entire agreement between the parties.

would be relieved of future rental payments, but would still owe past accrued rent. *Id.* at 549-50. Thus, the parties contemplated at the time of contracting defendant's precise breach of duty, and they bargained for remedies in the event defendant took no action to obtain the necessary permits. Here, no agreement between the parties contemplated that Simplot would expect payment from North Liberty for products it did not order or receive, and no agreement sets forth a remedy in the event this conduct occurred.

Finally, Simplot argues that because it has refunded North Liberty's account for the purchase price and related finance charges for all but one disputed transaction, North Liberty's implied-covenant claim must fail. "[T]he fact that a breach was cured does not eliminate all consequences flowing from the breach." *Vlieger*, 2005 WL 1963002, at *3 (citing **Restatement § 242 cmt. a** (stating remedies may be available for even cured breaches))). Here, North Liberty lacks confidence in Simplot's calculation of the amount owed, as even during this litigation, North Liberty has been able to identify additional sideways transactions using its account. Although Simplot refunded the accrued finance charges related to the sideways transactions, Simplot did not refund finance charges accrued on products actually ordered by North Liberty during the nine months that North Liberty waited for Simplot to (partially) reconcile its account prior to Hart's death. And as Simplot recognizes, it did not credit North Liberty's account for one of the Castillo sideways transactions. Accordingly, that Simplot refunded North Liberty's account for some of the disputed transactions does not bar North Liberty's implied-covenant claim.

I deny summary judgment to Simplot on North Liberty's claim of breach of the implied covenant of good faith and fair dealing.

## III. CONCLUSION

Simplot's motion for summary judgment (Doc. 58) is **granted in part and denied in part**. North Liberty's only remaining counterclaims are for breach of contract related

to rebates for the sideways transactions and for breach of the implied covenant of good faith and fair dealing.

      **IT IS SO ORDERED** this 27th day of October, 2020.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa